UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,           Cr. No. 10-20146

     v.                    U.S. District Judge Bernard Friedman

LARRY GENE ADAMS,

                Defendant.

_____/

## DEFENDANT LARRY GENE ADAMS'
## MOTION FOR COMPASSIONATE RELEASE

Larry Gene Adams respectfully moves this Court to grant compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). He raises "extraordinary and compelling reasons" for release. Mr. Adams has more than one serious medical condition that puts him at particular risk of serious complications or even death from COVID-19, a rapidly spreading infectious disease that has been detected at his facility. As has been well-documented, prison environments make preventing infection from COVID-19 essentially impossible because of a lack of social distancing and hygiene. By last count, since the onset of the pandemic, at least 222 inmates and 4 staff have died of the disease in federal prisons nationwide.[1] According to the BOP, there are currently 1.519 active inmate COVID-19 infections at 127 of their facilities and 41

---

[1] *See* BOP, COVID-19 Cases, https://www.bop.gov/coronavirus/ (last visited February 24, 2021).

RRC's (Residential Reentry Centers), and 1,661 staff infections.[2]  At FCI Hazelton, where Mr. Adams is held, there are currently 2 active COVID-19 infections among the inmates, and 11 active infections among the staff.[3]

Given Mr. Adams' risk of serious illness or even death if he were to contract COVID-19, compassionate release serves the interests of justice.

## I.   **Procedural History**

In October 2009, a confidential informant ("CI") working for the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") was introduced to the Defendant, Larry Gene Adams.   Subsequently, over the course of the next few weeks, Mr. Adams sold weapons to the CI, which included a pistol and rifle. (ECF No. 1, PageID. 1-3).

On April 1, 2010, Defendant Larry Adams was charged in an Indictment with two counts of Felon In Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1). (ECF No. 1, PageID. 1-3).  He consented to detention pending trial.  (ECF No. 10, PageID. 16).  On August 31, 2010, Mr. Adams pled guilty to counts 1 and 2 of the Indictment. (ECF No. 15, PageID. 31).  On November 2, 2010, he was sentenced to 70 months as to count 1, and 80 months as to count 2, to be served consecutively for a total sentence of 150 months imprisonment.  (ECF No. 20, PageID. 60-64).  On November 16, 2010, Mr. Adams was sentenced in State court (Oakland County) for

---

[2] *Id.*
[3] *Id.*

a separate pending case for Assault and Unarmed Robbery, to a term of 10 to 40 years, concurrent to the federal sentence. (Exhibit 1: State Judgment Order, *filed under seal*).

Mr. Adams has been in federal custody since May 18, 2010.  He is currently incarcerated at FCI Hazelton in Pennsylvania and his projected release date is July 22, 2021. (Exhibit 2: BOP Public Information, *filed under seal*).

On February 3, 2021, the Federal Community Defender was appointed by the Court to assist Mr. Adams in filing a Motion for Compassionate Release. (ECF No. 21, PageID. 66).

Counsel has reviewed Mr. Adams' medical records. They confirm that he suffers from serious medical conditions.  (Exhibit 3: Current Health Problems, Pages from BOP 2021 Medical Records, *filed under seal*).  The records indicate that Mr. Adams suffers from Type 2 diabetes (insulin dependent), high blood pressure, and high cholesterol.  He injects insulin twice daily, uses an inhaler, and takes medication for high blood pressure and high cholesterol.  (Exhibit 4: Medication Summary, *filed under seal*). He is also overweight, at 6'0" tall and weighing 199 pounds. (Exhibit 5: Current weight, Page from BOP 2020 Medical Records, *filed under seal*).

According to the CDC, the combination of these medical conditions places Mr. Adams at higher risk for serious illness from COVID-19.[4]

## II.   Legal Framework of Compassionate Release

### A.   Compassionate Release Before the First Step Act

The compassionate release statute empowers courts to reduce a defendant's sentence whenever "extraordinary and compelling reasons warrant such a reduction."  18 U.S.C. § 3582(c)(1)(A)(i).  The statute was first enacted as part of the Comprehensive Crime Control Act of 1984 to serve as a "safety valve" to enable judges to reassess whether a sentence reduction was warranted by factors previously addressed through the abolished parole system. S. Rep. No. 98-225, at 121 (1983). The Sentencing Commission defined "extraordinary and compelling reasons" as including medical conditions, age, family circumstances, and "other reasons." U.S.S.G. § 1B1.13, comm. n.1 (A). As originally enacted, the statute left sole discretion for filing compassionate release motions with the Director of the BOP. But, over the course of three decades, the BOP rarely filed motions on behalf of inmates who met the eligibility criteria.

---

[4] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html

## B. Compassionate Release After the First Step Act

The First Step Act significantly changed § 3582, allowing defendants to directly petition courts for relief instead of leaving relief decisions solely with the BOP. 18 U.S.C. § 3582(c)(1)(A). "The First Step was passed against the backdrop of a documented infrequency with which the BOP filed motions for a sentence reduction on behalf of defendants." *United States v. Redd*, No. 1:97-CR-00006-AJT, 2020 WL 1248493, at *7 (E.D. Va. Mar. 16, 2020). The compassionate release statute, as amended by the First Step Act, authorizes district courts to grant relief whenever "extraordinary and compelling reasons" warrant a reduction, consistent with the sentencing factors outlined in 18 U.S.C. § 3553(a) and the Sentencing Commission's applicable policy statements—regardless of the BOP's position.

Thus, a district court can grant a sentencing reduction under 18 U.S.C. § 3582(c)(1)(A), where "extraordinary and compelling reasons warrant such a reduction" and "a reduction [would be] consistent with applicable policy statements issued by the Sentencing Commission." Mr. Adams' request for compassionate release does not ask the Court to review a BOP decision. Rather, the statutory responsibility to decide whether to extend compassionate release to Mr. Adams rests solely with the Court. Moreover, since the First Step Act took effect, courts have continued to expand compassionate release, finding "extraordinary and compelling

reasons" in circumstances beyond, or combined with, the factors of age, medical condition, and family needs the BOP has typically identified.

Since passage of the First Step Act, courts have recognized "extraordinary and compelling reasons" in several circumstances, including in situations "other than those set forth in U.S.S.G. § 1B1.13 cmt. n.1 (A)-(C)." *Redd*, 2020 WL 1248493, at *8; *United States v. Young*, No. 2:00-cr-0002-1, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020) (recognizing "a majority of the district courts that have considered the issue have likewise held, based on the First Step Act, that they have the authority to reduce a prisoner's sentence upon the court's independent finding of extraordinary or compelling reasons").

Indeed, recognizing the expanded scope of the § 3582(c)(1)(A) in the First Step Act, other courts have relied on factors outside of health in granting sentencing relief. *See, e.g., Cantu*, 2019 WL 2498923, at *5; *Cantu-Rivera*, 2019 WL 2578272, at *2. These factors have included the following:

(1) family reunification;

(2) family caretaking needs;

(3) whether the government is opposed to the reduction;

(4) time already served;

(5) rehabilitation, including involvement in BOP programming;

(6) changes in sentencing policy;

6

(7) history of employment; and

(8) assistance to authorities.

*See, e.g., Cantu*, 2019 WL 2498923, at *5 (family reunification, government non-opposition); *Cantu-Rivera*, 2019 WL 2578272, at *2 (time served, rehabilitation, sentencing policy); *Beck*, 2019 WL 2716505, at *7 (employment, assistance to authorities, time served, health issues); *United States v. Urkevich*, No. 8:03CR37, 2019 WL 6037391 (D. Neb. Nov. 14, 2019) (reducing sentence based on "the injustice of facing a term of incarceration forty years longer than Congress now deems warranted for the crimes committed).

Moreover, as the BOP faces a rapidly escalating health crisis because of COVID-19, several judges in this district have recognized that this pandemic, for an offender with pre-existing health problems rendering them vulnerable to severe complications from COVID-19, is an extraordinary situation warranting release under § 3582(c)(1)(A)(i). *United States v. Saladrigas*, Cr No 13-20913, ECF No. 129 (E.D. Mich. May 13, 2020) (Borman, J.); *United States v. Hunt*, No. 18-20037, 2020 WL 2395222 (E.D. Mich. May 12, 2020) (Hood, C.J.); *United States v. Reddy*, No. 13-CR-20358, 2020 WL 2320093, at *4 (E.D. Mich. May 11, 2020) (Leitman, J.); *United States v. Atwi*, No. 18-20607, 2020 WL 1910152 (E.D. Mich. Apr. 20, 2020) (Michelson, J.); *Samy v. United States*, No. CR 16-20610-1, 2020 WL 1888842 (E.D. Mich. Apr. 16, 2020) (Tarnow, J.).

7

III.   **Mr. Adams Has Exhausted His Administrative Remedies**

Under 18 U.S.C. § 3582(c)(1)(A)(i), an inmate may move for a reduction of sentence based on extraordinary and compelling reasons "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."

Mr. Adams has complied with this requirement and fully exhausted his administrative remedies.  He sought release from the Warden of FCI Hazelton on December 12, 2020 (Exhibit 6: Request to Warden for Release, *filed under seal*), and was denied on December 17, 2020. (Exhibit 7: Denial by Warden, *filed under seal*).

As a result, this Court has jurisdiction to address the merits of Mr. Adams' request for compassionate release under § 3582(c)(1)(A)(i).

IV.   **Extraordinary and Compelling Reasons Warrant Release**

Under *United States v. Jones*, because Mr. Adams has properly exhausted his administrative remedies, the Court must proceed through the following three-step inquiry:

At step one, a court must "find[]" whether "extraordinary and compelling reasons warrant" a sentence reduction. 18 U.S.C. § 3582(c)(1)(A)(i). At step two, a court must "find[]" whether "such a

8

reduction is consistent with applicable policy statements issued by the Sentencing Commission." Id. § 3582(c)(1)(A) (emphasis added). . . . At step three, "§ 3582(c)[(1)(A)] instructs a court to consider any applicable § 3553(a) factors and determine whether, in its discretion, the reduction authorized by [steps one and two] is warranted in whole or in part under the particular circumstances of the case." [Dillon v. United States, 560 U.S. 817, 827 (2010).]

*United States v. Jones*, No. 20-3701, 980 F.3d 1098, 1107-08 (6th Cir. 2020) (first four alterations in original) (footnotes omitted). If there is no "applicable" policy statement, "district courts have discretion to define 'extraordinary and compelling' on their own initiative." *United States v. Elias*, No. 20-3654, 2021 U.S. App. LEXIS 251, at *6 (6th Cir. Jan. 6, 2021) ("in the absence of an applicable policy statement for inmate-filed compassionate-release motions, district courts have discretion to define 'extraordinary and compelling' on their own initiative.") (citing *Jones*, 980 F.3d at 1111; *United States v. Ruffin*, 978 F.3d 1000, 1007 (2020)).

Here, the Court should find the risk posed to Mr. Adams from his medical conditions and the spread of COVID-19 at FCI Hazelton constitutes extraordinary and compelling reasons for compassionate release.

9

1.     **Mr. Adams' Type 2 Diabetes, High Blood Pressure and Body Mass Index of 27 (Overweight) are CDC recognized COVID-19 risk factors**

Mr. Adams's medical records from the BOP indicate he has Type 2 diabetes, requiring twice daily insulin injections to control; high blood pressure, requiring daily oral medication to control; high cholesterol, requiring daily oral medication to control; and he is overweight at 199 pounds at 6'0" tall, with a body mass index of 27. He also uses an inhaler to aid his breathing. (See Exhibits 3, 4 and 5, *filed under seal*).

Mr. Adams' multiple medical issues line up almost perfectly with the risk factors associated with severe illness from COVID-19. Centers for Disease Control and Prevention, *People of Any Age with Underlying Medical Conditions* (revised June 26, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html.    Mr. Adams' Type 2 diabetes, weight, and hypertension are all on the CDC's list of conditions that put individuals at risk of severe illness or death from COVID-19.[5]

---

[5] Both obesity and diabetes are statistically correlated to the need for eventual intubation and/or death within 7 days of hospitalization. Bertrand Carriou, et al., *Phenotypic characteristics and prognosis of inpatients with COVID-19 and Diabetes: The CORONADO Study* (May 29, 2020), https://link.springer.com/article/10.1007/s00125-020-05180-x.

Moreover, experts are beginning to focus on hyperlipidemia (high cholesterol) as a factor linked to many COVID-19 deaths. David Templeton, *Cholesterol Could be the Culprit in COVID-19 Deaths*, Pittsburgh Post-Gazette (July 7, 2020), https://www.post-gazette.com/news/health/2020/06/07/Cholesterol-COVID-19-deaths-study-scripps-research-institute-underlying-conditions/stories/202006040179.

Courts around the country have come to the same conclusion regarding diabetes, alone or combined with other serious medical conditions, and notwithstanding how the condition was managed before COVID-19.[6] Like

---

[6] *See United States v. Lopez*, 2020 WL 2489746 (D.N.M. May 14, 2020); *United States v. Barber*, 2020 WL 2404679 (D. Or. May 12, 2020); *United States v. Rivernider*, 2020 WL 2393959 (D. Conn. May 12, 2020); *United States v. Hunt*, 2020 WL 2395222 (E.D. Mich. May 12, 2020); *United States v. Ramirez*, 2020 WL 2402858 (D. Mass. May 12, 2020); *United States v. Al-Jumail*, 2020 WL 2395224 (E.D. Mich. May 12, 2020); *United States v. Simpson*, 2020 WL 2323055 (N.D. Cal. May 11, 2020); *United States v. Reddy*, 2020 WL 2320093 (E.D. Mich. May 11, 2020); *United States v. Connell*, 2020 WL 2315858 (N.D. Cal. May 8, 2020); *United States v. Quintero*, 2020 WL 2175171 (W.D. N.Y. May 6, 2020); *United States v. Lacy*, 2020 WL 2093363 (C.D. Ill. May 1, 2020); *United States v. Ardila*, 2020 WL 2097736 (D. Conn. May 1, 2020); *United States v. Rivera*, 2020 WL 2094094 (S.D.N.Y. May 1, 2020); *United States v. Pinkerton*, 2020 WL 2083968 (C.D. Ill. Apr. 30, 2020); *United States v. Saad*, 2020 WL 2065476 (E.D. Mich. Apr. 29, 2020); *United States v. Lucas*, 2020 WL 2059735 (W.D.N.Y. Apr. 29, 2020); *United States v. Bertrand*, 2020 WL 2179387 (N.D. Fla. Apr. 29, 2020); *United States v. Musumeci*, 1:07-cr-00402-RMB-1, DE 58 (S.D. N.Y. Apr. 28, 2020); *United States v. Dillard*, 1:15-cr-170-SAB, DE 71 (D. Idaho Apr. 27, 2020); *United States v. Tillman*, 2020 WL 1950835 (W.D. Mich. Apr. 23, 2020); *United States v. Logan*, 1:12-cr-00307-LEK-1, DE 179 (N.D. N.Y. Apr. 22, 2020); *United States v. Bess*, 2020 WL 1940809 (W.D.N.Y. Apr. 22, 2020); *United States v. Burrill*, 2020 WL 1846788 (N.D. Cal. Apr. 10, 2020); *United States v. Trent*, 2020 WL 1812242 (N.D. Cal. Apr. 9, 2020); *United States v. Hansen*, 2020 WL 1703672 (E.D. N.Y. Apr. 8, 2020); *United States v. Winckler*, 2020 WL 1666652 (W.D. Pa. Apr. 3, 2020); *United States v. Zukerman*, 2020 WL 1659880 (S.D.N.Y. Apr. 3, 2020); *United States v. Resnick*, 2020 WL 1651508 (S.D.N.Y. Apr. 2, 2020); *United States v. Colvin*, 2020 WL 1613943 (D. Conn. Apr. 2, 2020); *United States v. Rodriguez*, 2020 WL 1627331 (E.D. Pa. Apr. 1, 2020); *United States v. Muniz*, 2020 WL 1540325 (S.D. Tex. Mar. 31, 2020); *United States v. Harpine*, 6:91-cr-60156-MC-1, DE 221 (D. Or. Mar. 27, 2020).

11

incarcerated people generally, non-incarcerated individuals with diabetes, hypertension and obesity are more likely to be infected with COVID-19. See Ranganath Muniyappa & Sriram Gubbi, "COVID-19 pandemic, coronaviruses, and diabetes mellitus," Am. J. Physiology: Endocrinology and Metabolism 318, Mar. 31, 2020, available at https://journals.physiology.org/doi/pdf/10.1152/ajpendo.00124.2020 (finding that "[i]ndividuals with diabetes mellitus (DM), hypertension, and severe obesity (BMI 40 kg/m2) are more likely to be infected and are at a higher risk for complications and death from COVID-19") (emphasis added). Mr. Adams has diabetes and hypertension and, although he is not severely obese (his body mass index is 27), he is still more vulnerable to get COVID-19, and, if he contracts COVID-19 in the BOP, he is more likely to suffer the worst of its consequences.

**2.     Mr. Adams' Body Mass Index (BMI) of 27 is a CDC recognized COVID-19 risk factor**

Mr. Adams' BOP medical record from November 2020 indicates that he weighs 199 pounds. (Exhibit 5: Current weight, Page from Defendant's BOP Medical Record from 11/9/2020, *filed under seal*). At the time of sentencing, the probation department listed his height at 6'0". Thus, his BMI (body mass index) is

27, and he is overweight.[7]   On October 6, 2020, the CDC updated their list of people

at risk for severe illness due to COVID-19, and that list includes a BMI of 25 or

higher.[8]

Mr. Adams' weight and BMI over 25 increase his risk of severe illness from

COVID-19.  This factor, in and of itself, is enough to establish an extraordinary and

compelling reason for a sentence reduction.  Courts around the country have held as

much for people who are obese and in facilities with positive coronavirus cases.[9]

---

[7]

https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html

[8] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html  CDC updates, expands list of people at risk of severe COVID-19 illness.

[9] *See, e.g.*, *United States v. Handy*, 3:10-cr-00128-RNC-8, 2020 WL 2487371 (D. Conn. May 14, 2020); *United States v. Barber*, 6:18-cr-00446-AA, 2020 WL 2404679 (D. Or. May 12, 2020); *United States v. Hunt*, 2:18-cr-20037-DPH-DRG, 2020 WL 2395222 (E.D. Mich. May 12, 2020); *United States v. Ullings*, 1:10-cr-00406-MLB-1, 2020 WL 2394096 (N.D. Ga. May 12, 2020); *United States v. Foreman*, 3:19-cr-00062-VAB-1, 2020 WL 2315908 (D. Conn. May 11, 2020); *United States v. Jenkins*, 99-cr-00439-JLK-1, 2020 WL 2466911 (D. Co. May 8, 2020); *United States v. Quintero*, 6:08-cr-06007-DGL-1, 2020 WL 2175171 (W.D. N.Y. May 6, 2020); *United States v. Howard*, 4:15-cr-00018-BR-2, 2020 WL 2200855 (E.D. N.C. May 6, 2020); *United States v. Lacy*, 3:15-cr-30038-SEM-TSH-1, 2020 WL 2093363 (C.D. Ill. May 1, 2020); *United States v. Ardila*, 3:03-cr-00264-SRU-1, 2020 WL 2097736 (D. Conn. May 1, 2020); *United States v. Delgado*, 3:18-cr-00017-VAB, 2020 WL 2464685 (D. Conn. Apr. 30, 2020); *United States v. Dillard*, 1:15-cr-170-SAB, Dkt. No. 71 (D. Idaho Apr. 27, 2020); *United States v. Joling*, 6:15-cr-00113-AA-1, 2020 WL 1903280 (D. Or. Apr. 17, 2020); *United States v. Trent*, 3:16-cr-00178-CRB-1, 2020 WL 1812242 (N.D. Cal. Apr. 9, 2020); *United States v. Zukerman*, 1:16-cr-00194-AT-1, 2020 WL 1659880 (S.D. N.Y. Apr. 3, 2020).

According to a recent French study, obese and overweight people are at high risk of suffering severe cases of Covid-19.[10]  The research shows how carrying extra pounds puts patients at risk of more serious disease and death. Only one in every 10 people who end up in intensive care with Covid-19 were in a range of healthy weight, the study found.

Researchers led by Francois Pattou, the head of Lille University Hospital's general and endocrine surgery department in France, found that about half of the 124 intensive-care patients with Covid-19 in a sample they studied were obese and most of the remaining ones were overweight.  By contrast, only a quarter suffered from obesity and another quarter were overweight in a control group of several hundred patients admitted to intensive care for reasons unrelated to the pandemic.  People with a body mass index of 30 or more were considered obese, matching international thresholds from the World Health Organization and the U.S. Centers for Disease Control and Prevention.

"The increased risk posed by this virus to people living with obesity could not be clearer," Pattou said. "Our data show that the chances of increasing to more severe disease increases with BMI, to the point where almost all intensive care Covid-19 patients with severe obesity will end up on a ventilator."  As many as 87% of patients

---

[10] https://www.bloomberg.com/news/articles/2020-08-31/obese-patients-at-high-risk-of-severe-covid-illness-study-finds

who were severely obese required a ventilator to continue breathing, Pattou and colleagues found.

The government may argue that obesity is a condition a defendant may "recover from," or have control over, and therefore, it does not warrant consideration. However, there are a number of factors to consider. First, due to COVID-related lockdowns, inmates can't exercise regularly. Second, the BOP is responsible for inmates' diets and the food that is available to them to eat.[11] Third, it's incredibly difficult to lose weight/maintain weight loss.[12]

---

[11] *See* Joe Fassler & Claire Brown, *Prison Food Is Making U.S. Inmates Disproportionately Sick*, The Atlantic (Dec. 27, 2017), https://www.theatlantic.com/health/archive/2017/12/prison-food-sickness-america/549179/, and Baylen Linnekin, *Prison Food Is a National Tragedy*, Reason (Dec. 22, 2018), https://reason.com/2018/12/22/prison-food-is-a-national-tragedy/. For an example of a prison meal, see Alysia Santo & Lisa Iaboni, What's in a Prison Meal?, The Marshall Project (July 7, 2015), https://www.themarshallproject.org/2015/07/07/what-s-in-a-prison-meal

[12] *See* Gortmaker, Steven L et al., "Changing the future of obesity: science, policy, and action." *Lancet* (London, England) vol. 378, 9793 (2011): 838-47, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3417037/ (advocating obesity prevention efforts because "it becomes increasingly difficult to reverse obesity trends as excessive weight accumulates.")*;* Kar, Subhranshu Sekhar et al., "Childhood obesity-an insight into preventive strategies." Avicenna Journal of Medicine vol. 4,4 (2014): 88-93, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4183902/#:~:text=Once%20obesity%20is%20established%2C%20it%20is%20very%20difficult,of%20behavioral%20changes%2C%20diet%20control%2C%20and%20physical%20activity (advocating prevention efforts among children because "[o]nce obesity is established, it is very difficult to reverse through interventions" whether in childhood or adulthood).*;* Gina Kolata, *After 'The Biggest Loser,' Their Bodies Fought to Regain Weight*, New York Times (May 2, 2016) (due to substantial and long-lasting metabolic changes, "few individuals can maintain weight loss for more than a few months"), https://www.nytimes.com/2016/05/02/health/biggest-loser-weight-loss.html.

3.     **The COVID-19 Outbreak at FCI Hazelton is an additional "extraordinary and compelling" reason for release**

Mr. Adams is at an increased risk of death or serious illness from COVID-19. There are currently active COVID-19 cases at Mr. Adams' place of incarceration, FCI Hazelton.[13]

The Court should have serious concerns for Mr. Adams' health and safety in FCI Hazelton.  The prison currently has active infections of prisoners and staff alike. Despite this increased risk of infection, not all prison populations are being prioritized for inoculation.[14]   Continuing to incarcerate Mr. Adams under such conditions while the virus runs rampant is a potentially deadly decision with no end in sight. *See Beth Schwartzapfel et. al, 1 in 5 Prisoners in the US Has Had COVID-19, 1,700 Have Died*, AP NEWS (Dec. 18, 2020), https://apnews.com/article/pandemics-race-and-ethnicity-prisons-united-states-coronavirus-pandemic-0bef0673013aa579551db5ad61b885e0 (reporting that although one in every five state and federal prisoners have tested positive for the coronavirus, "[t]hat number is a vast undercount," and that many infected prisoners become sicker than they need to be due to inadequate care); *see also Danielle Ivory,*

---

[13] *See* BOP, COVID-19 Cases, https://www.bop.gov/coronavirus/
[14] Michael Balsamo, Reversing Course, Feds Say Some US Inmates Get Virus Vaccine, AP NEWS (Dec. 22, 2020), https://apnews.com/article/coronavirus-pandemic-prisons-d2c1a3013351ed42cf75a194e4661cf3 ("The Federal Bureau of Prisons says it has started to give the coronavirus vaccine to some high-risk inmates but won't say how many inmates have been vaccinated or how it selects those to receive the vaccine." (emphasis added)).

*"We Are Not a Hospital": A Prison Braces for the Coronavirus*, N.Y. Times (March

17, 2020), https://www.nytimes.com/2020/03/17/us/coronavirus-prisons-jails.html

(citing densely populated living conditions, shortage of masks, soap, and hand

sanitizer, and the inability to routinely disinfect surfaces and maintain safe distances

between inmates and guards as reasons prisoners are at increased risk of infection);

Courtney Bublé, *Federal Prisons Pose 'Imminent Danger' in Spreading COVID-19,*

*Union      Says*,      GOV'T      EXEC.      (April      6,      2020),

https://www.govexec.com/oversight/2020/04/federal-prisons-pose-imminent-

danger-spreading-covid-19-union-says/164390/ (detailing a prison workers' union

complaint to OSHA complaining of "imminent danger" due to the BOP's failure to

follow national safety guidelines).

It appears from Mr. Adams' BOP medical records that he has already tested

positive for COVID-19 in January 2021 (Exhibit 8: Covid test results, *filed under*

*seal*).   The Journal of the American Medical Association published an article

reporting that, in early testing, not all individuals infected with COVID-19

developed antibodies.[15] And even in those who do develop an immune response, at

---

[15] *COVID-19 and Postinfection Immunity*, J. of the Am. Med. Assoc. (JAMA) (May 11, 2020)
("[G]reater clinical severity produced higher antibody titers."),
https://jamanetwork.com/journals/jama/fullarticle /2766097.

least with other coronaviruses, "immunity seems to wane quickly."[16] There have

been numerous reported cases of re-infection with the COVID-19 virus.[17]

Furthermore, the dosing of the virus is much more problematic in a prison

setting based on the risk of a larger "viral dose" or "viral load": asymptomatic

infections, while larger doses can be lethal.[18]

> The importance of viral dose is being overlooked in discussions
>
> of the coronavirus. As with any other poison, viruses are usually more
>
> dangerous in larger amounts. Small initial exposures tend to lead to
>
> mild or asymptomatic infections, while larger doses can be lethal.[19]

---

[16] Antonio Regalado, *What If Immunity to COVID-19 Doesn't Last?*, MIT Tech. Rev. (Apr. 27, 2020), https://www.technologyreview.com/2020/04/27/ 1000569/how-long-are-people-immune-to-covid-19/.

[17] *See, e.g.*, Sarah McCammon, *13 USS Roosevelt Sailors Test Positive for COVID-19, Again*, N.P.R. (May 16, 2020) (reporting that 13 sailors who had apparently recovered from COVID-19 and received negative test results had tested positive for a second time), https://www.npr.org/sections/coronavirus-live-updates/2020/05/16/857379338/5-uss-roosevelt-sailors-test-positive-for-covid-19-again; Brittany Mejia, *A patient's return to hospital COVID-19 unit underscores uncertainty to come*, L.A. Times (May 13, 2020) (reporting a case of a woman who was hospitalized in Victorville with COVID-19, discharged in early April, readmitted about two weeks later, and tested positive a second time),  https:/ /www.latimes.com/california/story/2020-05-13/coronavirus-test-second-infection-hospital; Kyunghee Park, *Coronavirus May 'Reactivate' in Cured Patients, Korean CDC Says*, Bloomberg (Apr. 8, 2020) (reporting the Korea Centers for Disease Control and Prevention announced a formal investigation into over 50 patients retesting positive for COVID-19), https://www.bloomberg.com/news/articles/ 2020-04-09/coronavirus-may-reactivate-in-cured-patients-korean-cdc-says.

[18] Joshua D. Rabinowitz & Caroline R. Bartman, *These Coronavirus Exposures Might Be the Most Dangerous*, New York Times (Apr. 1, 2020), https://www.nytimes.com/2020/04/01/opinion/coronavirus-viral-dose.html.

[19] *Id.*

Thus, "not all exposures to the coronavirus" are the same.[20] As the New York Times writes, "stepping into an office building that once had someone with the coronavirus in it is not as dangerous as sitting next to that infected person for an hourlong train commute."[21] Similarly, sitting next to an infected person for an hourlong train commute is not nearly as dangerous as living alongside other infected inmates, in a closed setting, with shared surfaces and inadequate ventilation. In the latter scenario, each individual is in danger of "high-dose exposures, which are most likely to occur in close in-person interactions—such as coffee meetings, crowded bars and quiet time in a room with Grandma[,]" and, of course, in the close quarters of prison units.[22] "In-person interactions are more dangerous in enclosed spaces and at short distances, with dose escalating with exposure time."[23]

The longer Mr. Adams remains contained in an enclosed space with others who are spreading the virus through aerosolization, the higher his viral load, and the greater the risk that he will become even more seriously ill should he be re-infected. Mr. Adams' circumstances thus establish extraordinary and compelling reasons for his compassionate release. U.S.S.G. § 1B1.13, Advisory Comment 1(A) &1(D) (advising extraordinary and compelling reasons exist when a defendant is "suffering

---

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.*

from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover").

### 4.    Impact of the COVID-19 Lockdown

Another factor the Court can consider is the impact of the COVID-19 lockdown on Mr. Adams.  A result of the pandemic has been the lockdown of federal prisons, which in turn affects the conditions of their confinement.   Other district courts have recently cited the harsh prison conditions and lack of programming opportunities due to the coronavirus as reasons to grant relief. *See e.g.*, *United States v. William White*, 19-cr-325-RC (D.D.C. Aug. 5, 2020) (referring to more punitive and less rehabilitative conditions at the jail due to COVID-19); *United States v. Antonio Cox*, 19-cr-235-JDB (D.D.C. July 29, 2020) (acknowledging lack of programming due to COVID-19).

### 5.      The Vaccine

The Government may argue that there is no need to release Mr. Adams since a vaccine for COVID-19 has been developed.  First, there is no evidence that the vaccine will totally prevent contracting the disease, especially in a prison setting where social distancing is virtually impossible.   Second, there are new variant strains of the virus on the rise, which may be resistant to the vaccine, which was created to prevent contracting the first strain of COVID-19.  What happens if/when these variant strains (which have been detected in this country already)[24] spread through the prison system with the same speed and lethality as the first strain?

In addition, we have no information about a concrete plan by the BOP to vaccinate prisoners.  There have been a few recent clients represented by the Federal Defender Office, for instance, who are being told they can get part one of vaccine, with no guarantees on part two, much less within the 3-4-week recommendation for effectiveness (of the Moderna and Pfizer vaccines, respectively).  The new variants are important for the Court to consider, as Dr. Fauci is concerned that the vaccines won't be effective in particular with the South African strain. [25]

---

[24] https://www.nbcnews.com/news/us-news/cdc-director-says-community-spread-south-african-strain-here-n1256133

[25] https://www.cnbc.com/2021/01/21/dr-fauci-says-covid-vaccines-appear-to-be-less-effective-against-some-new-strains.html

Simply "hoping" and "expecting" that the vaccine will be available to BOP prisoners, and that it will be effective against all variants of the disease, should not be relied upon. Against this pandemic of crisis proportions, the possibility that Mr. Adams may be vaccinated at an indeterminate date, after all correctional staff are vaccinated, does not abate the extreme and imminent threat the virus poses at present and does not moot the extraordinary and compelling reasons for a sentence reduction that exist here and now.

### 6. The § 3553(a) factors favor release

Mr. Adams is scheduled for release on July 22, 2021. (Exhibit 2: BOP Public Information). This Court has the ability to replace Mr. Adams' remaining term of incarceration with a period of home confinement. Such an approach would allow him to practice appropriate social distancing to protect himself from COVID-19, while still recognizing the serious nature of his offense. Home confinement is consistent with the sentencing factors set out in 18 U.S.C. § 3553(a), since Mr. Adams has served almost all of his sentence. Home confinement reflects the seriousness of the offense and provides a more just punishment, because it is safer for Mr. Adams yet still restricts his liberty. For the same reasons, it will protect the public and deter Mr. Adams from future criminal conduct. *Id.* § 3553(a)(2).

Mr. Adams has the support of his family and friends.  Upon his release, he will reside with his sister in Auburn Hills, Michigan.  A letter of support is attached. (Exhibit 9: Letter from Teboni Washington, *filed under seal*).

Mr. Adams will be able to find employment as a Cook or Chef upon his release.  He has worked as a Cook in prison for over 8 years, and in staff dining for 3 years.

As Judge Hood explained in granting release in light of the COVID-19 pandemic, this Court may still recognize its original sentence as "just" while also concluding "that the threat posed by COVID-19, in light of Defendant's underlying health conditions, constitutes an 'extraordinary and compelling reason' to modify his sentence under 18 U.S.C. § 3582(c)(1)(A)(I)." *United States v. Hunt*, No. 18-20037, 2020 WL 2395222, at *6 (E.D. Mich. May 12, 2020).

## **Conclusion**

For the foregoing reasons, the Court should grant Mr. Adams' Motion for Compassionate Release and enter an Order reducing his sentence to time served or, in the alternative, modify his judgment to allow for the remainder of his sentence to be served on home confinement.

Respectfully Submitted,

FEDERAL DEFENDER OFFICE

s/Stacey M. Studnicki
Attorney for Larry Gene Adams
613 Abbott St., Suite 500
Detroit, MI 48226
Stacey_studnicki@fd.org
313-967-5542

Dated: February 24, 2021

24

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,        Cr. No. 10-20146

   v.        U.S. District Judge Bernard Friedman

LARRY GENE ADAMS,

        Defendant.

_____/

## **CERTIFICATE OF SERVICE**

I certify that on February 24, 2021, I filed the foregoing paper with the through the court's electronic docketing system, which will send notification to opposing counsel of record.

*/s/ Stacey M. Studnicki*

25