UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,              Case Number 10-20146

-v-                                  Hon. Bernard A. Friedman

LARRY GENE ADAMS,

               Defendant.

_____/

**United States' Response to
the Defendant's Motion for Compassionate Release
<u>and Request for Home Confinement (ECF 25)</u>**

Adams is an illegal gun trafficker with an extensive criminal history of drug trafficking and violence. He readily sold semi-automatic pistols, rifles, stolen firearms, and at least one assault rifle with extended magazines, on the street. With the use of a confidential informant, the ATF purchased two guns from Adams. But their confidential informant could have purchased half a dozen guns form Adams. Adam told the CI that he could get "all the guns that he wanted."

Adams began serving his current sentence on November 2, 2010. He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A).

"[T]he mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify

compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). The government agrees that Adams' circumstances—including his heightened risk for severe complications from Covid-19 based on his confirmed "at increased risk" CDC risk factors—qualify as "extraordinary and compelling reasons" for release. But the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—do not support release because of Adams' extensive criminal history, the seriousness of the offense, the need for just punishment, and deterrence to criminal conduct. The government acknowledges that Adams has a projected release date of July 22, 2021, approximately four and a half months away. However, the § 3553(a) factors weight against his early release from prison.

The Bureau of Prisons has also administered 71,919 total doses of the Covid-19 vaccine as of March 8, 2021 and is distributing the vaccine to its staff and inmates as quickly as it is received by each institution. *See* CDC Covid-19 Vaccine Tracker and BOP COVID-19 Vaccination Implementation. Seventy BOP locations have received second doses. As of February 22, 2021, 11,233 staff and 8,753 inmates were fully inoculated.

The Bureau of Prisons also continues to assess its entire population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. This is especially important given the Bureau of Prisons' efforts—and "the legitimate concerns about public safety" from releasing inmates who might "return to their criminal activities," *Wilson v. Williams*, 961 F.3d 829, 845 (6th Cir. 2020).

## Background

On October 7, 2008, an ATF confidential informant (CI) learned that Adams had three guns for sale. (PSR ¶ 7). Two were Glock .40 caliber pistols and one was a 9mm pistol. (PSR ¶ 7). The CI called Adams who offered $400 for each Glock and a deal on the 9mm. (PSR ¶ 8). On October 8, the CI made plans to meet with Adams in Pontiac. (PSR ¶ 9).

Using the CI's vehicle, Adams left the meet location and returned an hour later. (PSR ¶ 9). Adams had the firearms. (PSR ¶ 9). The CI paid $400 for one Glock semi-automatic pistol. (PSR ¶ 9). Adams told the CI he still had two Glocks, a Hi-Point 9mm for $300, and an assault rifle for $250. (PSR ¶ 9). Adams advised the CI that he could get him all the

guns the he wanted. The Glock purchased by the CI was stolen out of Waterford Township on July 21, 2008. (PSR ¶ 10).

On or about October 13, 2008, the CI met with Adams. Adams had one Glock .40 caliber he could sell to the CI. Adams had a second Glock, which he loaned to someone for that evening, and could only sell both Glocks to the CI the next day. The CI arranged to contact Adams on October 14, 2008. No purchases were made on October 14.

On October 20, 2008, the CI contacted the ATF. (PSR ¶ 11). The CI had spoken to Adams who had a fully automatic AK assault rifle for $350. (PSR ¶ 11). The rifle came with a 30 round and a 60-round magazine. (PSR ¶ 11). Adams also offered to sell a Hi-Point .45 caliber pistol. (PSR ¶ 11). The CI and Adams met at the original meet location and together went to a second location. (PSR ¶ 11). At the second location, Adams approached a van parked in the driveway. (PSR ¶ 11). He retrieved an Norinco, SKS, 7.62 caliber assault rifle loaded with 24 rounds of ammunition. (PSR ¶ 11). Adams gave the assault rifle to the CI in exchange for $350. (PSR ¶ 11). Adams instructed the CI on how to shoot the rifle as a fully automatic weapon.

4

On November 18, 2008, the CI and Adams met again. Adams offered to sell a Glock pistol for $400. The next day, Adams explained that the man with the Glock was sick, and his girlfriend would not let Adams in the house to get the firearm.

Adams has an extensive criminal record. Adams' first adult conviction, larceny, occurred when he was 18 years-old. (PSR ¶ 30). At age 20, he was convicted of felony charges related to disobeying police officers twice in four months. (PSR ¶ 33-38). One of the charges involved a high speed chase where Adams crashed into a tree. (PSR ¶ 37). Adams was given the opportunity for a deferred prosecution under the Holmes Youthful Trainee Act (HYTA), but had his HYTA status revoked when he violated the court's orders. (PSR ¶ 38). One month later, he was convicted of delivery/manufacturing a controlled substance under 50 grams. (PSR ¶ 39). Again, Adams violated probation. (PSR ¶ 41).

On May 6, 1996, at age 22, he was convicted of felony escape from prison. (PSR ¶ 44). In 2000, he was convicted of two counts of delivery/manufacturing a controlled substance under 50 grams. (PSR ¶ 47). Adams was arrested alongside a wanted felon. (PSR ¶ 48). At age

26, Adams was charged as a Habitual Offender. (PSR ¶ 49). In 2004,

Adams was convicted of controlled substance second offense/double

penalty after he was arrested during the execution of a search warrant.

(PSR ¶ 51). In 2010, Adams pleaded guilty to assault and battery. (PSR

¶ 53-55).

Between 1998 and 2010, Adams was arrested four times for domestic

violence (PSR ¶ 62-64), armed robbery (PSR ¶ 66), and assault with a

dangerous weapon (PSR ¶ 68). The arrests did not result in charges.

On December 28, 2009, Adams committed a robbery. (PSR ¶ 56).

Armed with a firearm, Adams ordered the victim to empty his pockets.

(PSR ¶ 57). Adams next ordered the victim to follow him to an unknown

location, but the victim attempted to flee instead. (PSR ¶ 57). Adams

shot the victim in his lower body. (PSR ¶ 57). The victim got to his van

and drove away. (PSR ¶ 57). He later received assistance from a

passerby to get to a hospital. (PSR ¶ 57). The victim told police that he

had an ongoing dispute with Adams. (PSR ¶ 57). The victim later

learned that he was shot in the hip and the bullet traveled through both

testicles and into his other leg.

Adams began serving his prison sentence on November 2, 2010, and is currently incarcerated at Hazelton FCI. He is 46 years old and his projected release date is July 22, 2021. The underlying medical condition that places him at increased risk, per CDC guidelines, is type two diabetes mellitus. Adams has other health issues that are not identified by the CDC as creating an increased risk of severe illness from Covid-19. Nevertheless, Adams has moved for compassionate release, citing his medical conditions and the Covid-19 pandemic. On December 17, 2020, the Warden at Hazelton FCI denied his request for a reduction in sentenced based on his medical condition. Therefore, Adams has exhausted his request for administrative remedies and is eligible go seek compassionate release.

## Argument

I.   **The Bureau of Prisons has responded to Covid-19 by protecting inmates, instituting the administration of the vaccine at its facilities, and increasing home confinement.**

A.   **The Bureau of Prisons is increasing the number of inmates who are granted home confinement.**

The Bureau of Prisons has responded to Covid-19 by increasing the placement of federal prisoners in home confinement. Recent legislation now temporarily permits the Bureau of Prisons to "lengthen the

maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Currently, the Bureau of Prisons has over 7,500 inmates on home confinement, and the total number of inmates placed in home confinement from March 26, 2020 to the present (including inmates who have completed service of their sentence) is over 22,500. BOP Coronavirus FAQs. As the Sixth Circuit stressed, these efforts show that "[t]he system is working as it should": "A policy problem appeared,

and policy solutions emerged." *United States v. Alam*, 960 F.3d 831, 836 (6th Cir. 2020).

This policy solution is also tailored to the realities of the Covid-19 pandemic. As the Attorney General's directives have explained, the Bureau of Prisons is basing its home-confinement decisions on several factors:

> 1) Each inmate's age and vulnerability to Covid-19;
>
> 2) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and
>
> 3) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). These criteria account for justifiable concerns about whether inmates "might have no safe place to go upon release and [might] return to their criminal activities," as well as "legitimate concerns about public safety." *Wilson*, 961 F.3d at 845.

The Bureau of Prisons, after all, cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. *See id*. It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid

the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2).

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is thus important to evaluate "how . . . released inmates would look after themselves," *Wilson*, 961 F.3d at 845, including whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. If a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, for instance, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and

circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, 452 F.Supp.3d 705, 712 (E.D. Mich. 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is

11

especially true now, given the Bureau of Prisons' substantial and

ongoing efforts to address the Covid-19 pandemic.

### B. The Bureau of Prisons is receiving the Covid-19 vaccine and is in the process of administrating the vaccine in its facilities.

As of March 8, 2021, the Bureau of Prisons has acquired 75,395 doses

of the Covid-19 vaccine and is distributing it to staff and inmates. *See*

CDC Covid-19 Vaccine Tracker and BOP COVID-19 Vaccination

Implementation. The Bureau of Prisons has already initiated the first

dose of the vaccine in 71,919 staff members and inmates. *See* CDC

Covid-19 Vaccine Tracker and BOP COVID-19 Vaccination

Implementation. While the precise timing of each inmate's vaccination

will depend on many factors, the Bureau of Prisons is working swiftly to

vaccinate inmates who consent to receive the vaccine. Hazelton Federal

Correction Complex (FCC) consists of two facilities, FCI Hazelton

(where Adams is incarcerated) and USP Hazelton. Collectively,

Hazelton FCC has inoculated 321 inmates and 327 full-time staff

members.

## II.  The Court should deny Adams' motion for compassionate release.

Adams' motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Rather, a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, 960 F.3d 831, 832 (6th Cir.

13

2020). And as the Sixth Circuit has held, this statutory exhaustion requirement is mandatory. *Alam*, 960 F.3d at 832–36.

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for release. 18 U.S.C. § 3582(c)(1)(A). The defendant's "generalized fears of contracting Covid-19, without more," do not satisfy this requirement. *United States v. Jackson*, 2020 U.S. App. LEXIS 32269, at *6 (6th Cir. Oct. 13, 2020); *accord United States v. Bothra*, No. 20-1364, 2020 WL 2611545, at *2 (6th Cir. May 21, 2020).

*Third*, even if a defendant is eligible for compassionate release, a district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); *United States v. Ruffin*, 978 F.3d 1000, 1008–09 (6th Cir. 2020). Those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a). This Court's "initial balancing of the § 3553(a) factors during [the defendant's] sentencing" is presumed to "remain[] an accurate assessment as to whether those factors justify a sentence reduction"

14

when a defendant requests compassionate release. *United States v. Sherwood*, 2021 WL ____, at * ____ (6th Cir. Feb. 2, 2021).

## A.   Adams has shown "extraordinary and compelling reasons" for compassionate release.

Resolving the merits of a compassionate-release motion involves a "three-step inquiry": a district court must (1) "find that extraordinary and compelling reasons warrant a sentence reduction," (2) "ensure that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," and (3) "consider all relevant sentencing factors listed in 18 U.S.C. § 3553(a)." *Elias*, ___ F.3d ___, No. 20-3654, 2021 WL 50169, at *2 (6th Cir. Jan. 6, 2021); 18 U.S.C. § 3582(c)(1)(A). In *Elias*, 2021 WL 50169, at *2, the Sixth Circuit held that USSG § 1B1.13 is not an "applicable" policy statement for defendant-initiated motions for compassionate release. The government disagrees with that holding and preserves for further review its argument that § 1B1.13 remains binding. But, given the Sixth Circuit's holding in *Elias*, controlling circuit precedent now forecloses that argument before this Court.

The government agrees that Adams' circumstances qualify as "extraordinary and compelling reasons." Adams' medical records

15

establish that he has diabetes mellitus, type II (adult-onset), which the CDC has confirmed is a risk factor that places a person at increased risk of severe illness from Covid-19. *See* CDC Risk Factors (as updated). Given the heightened risk that Covid-19 poses to someone with that medical condition, Adams has satisfied the initial eligibility criteria for release under § 3582(c)(1)(A).

It is important to note that, although Adams acknowledges diabetes mellitus type II (adult-onset) is a serious health condition and a CDC confirmed risk factor, Adams has not been vigilant with his own care. Nor does he seem overly concerned about his diabetes while incarcerated. His medical records have numerous entries referencing his noncompliance with medical treatments:  refusing morning insulin, non-compliant with glucose checks, refusals to check his insulin levels, and poor history of compliance with recommended treatment. (Gov. Ex. 1, 13, 22, 29) and (Def. Ex. 3, 1-2, 4). Despite repeated consults with doctors, he was not properly taking care of his diabetes.

Adams also argues he has high blood pressure, high cholesterol, and is overweight. (ECF No. 25, PageID.80). High blood pressure and high cholesterol are not a CDC confirmed risk factor for Covid-19. CDC,

PEOPLE WITH CERTAIN MEDICAL CONDITIONS[1] (last visited Mar. 8, 2021). Adams has a body mass index (BMI) of 27 which is below the minimum threshold to rise to the level of a CDC confirmed risk factor. *Id.* The CDC acknowledges that high blood pressure and a BMI of 27 ***might*** cause an increased risk for severe illness from Covid-19. The CDC, nevertheless, has recognized there is "limited data and information about the impact of [these] medical conditions on the risk for severe illness from COVID-19." *Id.*

Adams tested positive for Covid-19 in January of 2021. (Def. Ex. 8). Adams was asymptomatic. (Gov. Ex. 1, 105-108 *(filed under seal)*). Adams reported no cough, fatigue, shortness of breath, body aches, sore throat, diarrhea, headache, loss of taste or smell, nausea, or vomiting. (Gov. Ex. 2, 30-39 *(filed under seal)*). Although there is no definitive answer, testing positive in the past does not guaranty that a person cannot get reinfected in the future. However, "having antibodies after infection does protect you against reinfection." (Alan Mozes, *Study*

---

[1] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html

*Shows Young COVID Survivors Can Get Reinfected*, WebMD (Feb. 4, 2021).[2] Adams is not immune, but he is certainly in a much safer position than before he contracted the virus.

Finally, Adams indicated that FCI Hazelton had two active Covid-19 infections among the inmates and eleven among the staff. (ECF No. 25, PageID.72). As of March 9, 2021, the circumstances have improved. Only two inmates and four staff are positive for Covid-19. (BOP COVID-19, https://www.bop.gov/coronavirus (last visited March 8, 2021).

Adams had Covid-19, was totally asymptomatic, and now has antibodies in his system which can fight off reinfection. Further, the number of infections are decreasing at his facility.

### B. The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons," he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. 18 U.S.C. § 3582(c)(1)(A). A defendant's failure to establish that the § 3553(a)

---

[2] https://www.webmd.com/lung/news/20210204/study-young-covid-survivors-can-get-reinfected#1

factors support relief is an independent basis for denying compassionate release. *United States v. Ruffin*, 978 F.3d 1000, 1008–09 (6th Cir. 2020); *accord United States v. Austin*, 825 F. App'x 324, 325–27 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors); *United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (same).

This Court's "initial balancing of the § 3553(a) factors during the defendant's sentencing" is presumed to "remain[] an accurate assessment as to whether those factors justify a sentence reduction". *United States v. Sherwood*, 2021 WL ____, at * ____(6th Cir. Feb. 2, 2021). The defendant must therefore "make a compelling case as to why the sentencing court's § 3553(a) analysis would be different if conducted today." *Id.* Here, even if the Court were to find that Adams established extraordinary and compelling reasons for his release, the § 3553(a) factors should still disqualify him.

Adams' history and characteristics casts significant doubt on whether he would abide by the release conditions and social-distancing protocols that could diminish his risk of contracting Covid-19 if released from custody.

His PSR reflected multiple violations of probation and parole which included using drugs (PSR ¶ 38, 41), failure to appear as directed (PSR ¶ 41), and a new arrest for drug charges (PSR ¶ 41). He was also convicted of felony escape from prison and habitual third offense. (PSR ¶ 44). Two months before he made an initial appearance in federal court, he was arrested for an assault and battery. (PSR ¶ 53). He was also arrested for assault with intent to commit great bodily harm and unarmed robbery. Adams shot the victim through the hip - while the victim was running away from Adams - who was robbing him at gunpoint. (PSR ¶ 57) When this Court sentenced Adams at age 36, he had amassed 10 adult convictions. (PSR ¶ 58).

At sentencing, Adams stood before the Court as an individual who spent half his life in and out of the criminal justice system. Despite multiple arrests, parole violations, and two terms of incarceration in prison, Defendant continued to engage in criminal behavior. Adams displayed a gross indifference to the safety of the public when he sold a variety of dangerous weapons on the street.

The Court is copiously aware of both the danger and the harm associated with the introduction and distribution of guns into the

community and on the streets. Adams, through his own admissions,
represented that he could sell as many guns as the CI needed. He sold
the CI an automatic weapon and taught the CI how to use it.
Defendant's access to guns and the number of guns he offered for sale
suggested that his transactions with the CI were not an isolated
incident. Defendant was actively attempting to procure guns that he
continuously offered to sell to the CI. There is no way to know how
many guns he sold, who got them, and how many times the guns
contributed to deadly violence on the community.

More violence is the last thing the community needs today. Police
departments in many cities have been stretched to their limits as
officers have either contracted Covid-19 or been placed in quarantine.
Some cities, including Detroit, have seen substantial spikes in shootings
and murders. Drug overdoses are skyrocketing. Adams has
demonstrated a total lack of respect and disregard for the law. His
crimes were serious and unquestionably had significant ramifications to
public safety. Throughout his life, he has repeatedly broken the law,
violated court orders, and was unsuccessful under several terms of
probation. Not only has the criminal justice system not been a deterrent

in the past, Adams has continued to graduate to more serious criminal

conduct. Adams' record is totally void of any evidence that he can abide

by the law or that he will follow the Court's orders.

## III.   If the Court were to grant Adams' motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Adams' motion despite the

government's arguments above, the Court should order that he be

subjected to a 14-day quarantine before release.

### Conclusion

Adams' motion should be denied.

Respectfully Submitted,

SAIMA S. MOHSIN
ACTING UNITED STATES ATTORNEY

s/*Matthew Roth*
Matthew Roth
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48070
Phone:  313-226-9186
E-Mail: Matthew.Roth2@usdoj.gov

Dated:  March 10, 2021

## CERTIFICATE OF SERVICE

I certify that on March 10, 2021, I electronically filed the foregoing document with the Clerk of the Court for the Eastern District of Michigan using the ECF system, which will send notification of the filing to all users of record.

I further certify that on March 10, 2021, I filed Exhibits 1 and 2 of the Government's Response, *under seal*, with the Clerk of the Court of the Eastern District of Michigan using the ECF system and I have secure emailed the same to counsel of record at:

Stacey Studnicki, Attorney for Defendant
Stacey_Studniki@fd.org

*s/ Matthew Roth*
Assistant U.S. Attorney